# EXHIBIT 1

| | |
|---|---|
| STATE OF MAINE<br>KENNEBEC, ss. | SUPERIOR COURT<br>CIVIL ACTION<br>DOCKET NO. _____ |

AMY GANTS,  )
an adult individual resident of Albion,  )
County of Kennebec, State of Maine,  )
  )
          Plaintiff,  )
  )
      v.  )
  )
PROBST ELECTRIC, INC.,  )
a Utah corporation registered to do  )
business in Maine, with a place of business  )
in Searsmont, Waldo County, State of Maine,  )
  )
and  )
  )
QUANTA SERVICES, INC.,  )
a Texas corporation with a subsidiary registered  )
to do business in Maine, with a place of business  )
in Searsmont, Waldo County, State of Maine,  )
  )
          Defendants  )

## COMPLAINT AND REQUEST FOR JURY TRIAL AND INJUNCTIVE RELIEF

Plaintiff Amy Gants ("Gants") makes the following complaint against Defendants Probst Electric, Inc. and Quanta Services, Inc. ("the Company"). She requests a jury trial.

### Parties

1. Gants is an adult individual with a residence in Albion, Maine in Kennebec County.

2. The Company is registered to do business in Maine with a registered agent in Readfield, Maine, and a place of doing business in Searsmont, Maine, which is located in Waldo County.

3. Venue lies in Kennebec County pursuant to 14 M.R.S. §§ 501, 505.

### Procedural background

4. This is an action for declaratory and injunctive relief and monetary damages to recoup unpaid wages and overtime owed to Gants as an employee and individual entitled to the protections of the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq.*, and federal wage and hour laws under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and the Maine personnel file law, 26 M.R.S. § 631.

### Jury demand

5. Gants demands trial by jury on all claims to the extent allowed by law.

### Factual background

6. Gants began working with the Company on October 11, 2017, as a field safety employee.

7. When she was hired, Gants received an Employee Handbook ("the Handbook"), denoting that Probst Electric is a Quanta Services Company.

8. The Handbook specifically describes whether employees are "exempt" or "non-exempt" as defined by the FLSA in Section 301 (the section is called "Employment Categories").

9. The Handbook further states that only "non-exempt" employees are paid overtime and *only* "non-exempt" employees are required to keep a record of their hours worked.

10. The Handbook also states that employees are eligible for Paid Time Off ("PTO"). There is no mention in the Handbook that employees do not receive PTO once they leave the Company.

11. Gants was hired by Terrance Louder. During her interview, Louder informed Gants that the Company would not be paying her hourly, because it could not afford to, and instead, that she would be an "exempt" salaried employee paid $65,000 annually.

12. Louder also informed Gants that she would be required to track and turn in all of her hours worked, even though she was a salaried employee and would not be paid overtime.

13. Although classified as an "exempt" employee, Gants's employment did not meet the Department of Labor ("DOL")'s "salary basis test." The Company treated her like an hourly employee.

14. In addition to requiring that Gants track her hours each week, the Company, in fact, paid Gants a different amount each week based on a variety of factors, including "per diem" pay. A salaried employee is paid the same amount per week regardless of hours worked.

15. When Gants worked more than 40 hours in one week, her paystubs show that the Company failed to pay her overtime at time and a half as required by law. Rather, the Company discounted her rate of pay for every additional hour she worked. (*See* **Exhibit A**).

16. As a so-called "exempt" employee, the Company was required to pay Gants on a salary basis and not penalize her for missing certain hours.

17. Nevertheless, Gants was reprimanded by Louder for not being at a job site on January 12, 2018, despite the fact that she had worked more 40 hours that week. When Gants pushed back on this, Louder told Gants that he would not be paying her more for working more than 40 hours and to "watch her hours."

18. In fact, whenever Gants would ask Louder to pay her overtime because she was working far beyond 40 hours per week, Louder's response was, "I know what they [the Company] are going to say if I go to them with this right now. Just control your hours."

3

19. In addition to failing the "salary basis test," the Company also fails the DOL's "exempt work" test with respect to Gants's employment. At no time during her employment with the Company did Gants perform exempt work.

20. Gants was never provided a job description. Her general job duties included things like field safety, site visits and audits, reporting of environmental spills, incident or accident reporting, attending weekly meetings with other safety professionals and clients, turning in job safety paperwork and helping to set up accounts with local vendors.

21. On or about October 27, 2017, Gants arrived in Maine to start work onsite. She was supposed to be trained during the first week, yet no one provided training or direction. Gants recalls having no idea what to do because she had been given absolutely no direction and no discretion to determine what to do next.

22. Gants did not have any supervisory or managerial duties. She could not hire, fire, interview or discipline employees. The Company would sometimes ask Gants to relay things to other employees, and would e-mail a topic to her the night before. From that e-mail, Gants would simply relay safety procedures from the e-mail in staff meetings.

23. Gants had no discretion to purchase supplies, issue compliance warnings or write-ups, or do anything without consulting a supervisor. All of Gants's purchases had to be approved by Louder and/or Greg Gerhardt, Project Supervisor. This means that Gants had no discretion whatsoever to bring in safety equipment even if she determined that it was needed based on her site visits.

24. In fact, the *one* time Gants went ahead and purchased needed safety equipment – a hazard barrier chain for the crane operator to use around the outriggers of his crane – Gerhardt

yelled at Gants. He told her to never buy anything without his or Louder's permission. Louder also later reprimanded Gants for buying safety equipment without permission.

25. Absolutely everything that Gants did had to be run by Louder or someone else at the Company. If Gants needed to spend any money, she would call up Louder, who was either in Utah or Maine, and have to explain what she wanted to do and why it was needed.

26. Gerhardt would often treat Gants like his personal secretary when on a job site. He would have Gants run errands for materials, reserve hotels, find places to eat, etc.

27. Between October 31, 2017, and November 4, 2017, Gants was required to perform "storm" work because a large storm had hit Maine. She and the linemen were working approximately 17-hour days. The linemen were paid at time and a half for *all* hours worked. Gants, in contrast, was not paid overtime for any of her hours worked, including those over 40.

28. On November 29, 2017, Louder told Gants that there was a former female field safety employee who was paid time and half for hours worked over 40 (even though she was classified as salaried) because her project required her to work long hours. Gants asked Louder why she couldn't get overtime like that woman. Louder responded, "I don't know who she was sleeping with to get that. You can't get that."

29. Although Louder was telling Gants to "limit" her hours or "watch her 40 hours," Gants was constantly reprimanded for not being on a site or in the office despite the fact that she had worked past 40 hours in one week.

30. Gants was also frequently contacted outside of the office and outside of normal work hours by Louder, Gerhardt and other field workers. She was never paid for that time.

31. Gants regularly worked hours above and beyond a standard 40-hour week in order to fulfill her job duties for the Company. Nevertheless, she was given *no* discretion to make

5

decisions, had no authority in executive or administrative matters and had no discretion to come and go without being reprimanded.

32. Accordingly, Gants was not an executive or administrator as defined by 26 M.R.S. § 663, 29 U.S.C. § 213 or the related regulations. Gants was a non-exempt employee under federal and Maine wage and hour laws and is entitled to overtime protections.

33. The Company was put on notice of Gants's misclassification via a letter Gants sent to Human Resources and other Company representatives on February 23, 2018. The Company made no effort to comply with the law and pay Gants her overtime and PTO as wages.

34. During a meeting in Pinedale, WY, on February 28, 2018, Gants specifically stated to the Company's general counsel, Richard Gunnerson, "you know I was not an exempt employee." He nodded, "yes." Yet, nothing has been done to pay Gants overtime owed to her.

35. During a phone call with the Quanta ethics line with two attorneys on April 4, 2018, the Company was again put on notice of Gants's misclassification and made no effort to comply with the law and pay Gants her overtime and PTO as wages.

36. Gants requested her personnel file in writing to the Company on April 18, 2018. She received no response. She was not provided her personnel file until 23 days later, after Gants's counsel had to send another request for the file under Maine law.

37. Despite not having her personnel file, Gants independently kept thorough records of her hours worked because the Company required her to.

38. Based on her records, Gants is entitled to $7,125.76 in unpaid overtime, not including interest.

39. On May 8, 2018, Gants sent the Company a demand for payment of these wages as required by Maine law.

40. The Company failed to make payment within eight days pursuant to 26 M.R.S. § 626-A.

41. After Gants left the Company's employ, her last paycheck indicated that she had 43 hours of PTO, yet she was never paid for that time.

42. The Handbook does not limit an employee's ability to receive PTO upon an employee's departure.

43. Based on her rate of pay using what the Company used in her own paystubs, Gants calculated that she is owed $1,343.75 in unpaid PTO.

44. Maine law treats unpaid PTO the same as wages for purposes of prompt payment upon an employee's departure.

45. On May 8, 2018, Gants sent the Company a demand for payment of her unpaid PTO as required by Maine law.

46. The Company failed to make payment within eight days pursuant to 26 M.R.S. § 626-A.

47. Gants was harmed, and continues to be harmed, by the Company's willful misclassification of her employment as well as the Company's continued violation of state and federal wage and hour laws.

## COUNT I
### Violation of 26 M.R.S. § 664(3)

48. Gants repeats and incorporates by reference all allegations set forth in the paragraphs above.

49. Gants was employed by the Company from approximately October 11, 2017, until February 23, 2018, and was an employee and individual entitled to the protections of the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq.*

7

50. The Company is, and at all relevant times was, subject to the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq.*

51. Although Gants regularly worked over 40 hours a week, she was not paid overtime wages for the hours worked in excess of 40 hours.

52. Throughout her entire employment with the Company, Gants was improperly classified as an exempt employee, while she was in fact a "non-exempt" employee as defined by the Maine wage and hour laws.

53. Gants's work was not the type that is exempt and management did not treat her like an exempt employee.

54. During Gants's employment, the Company required her to work a number of overtime hours for which she was not appropriately paid at an overtime rate.

55. 26 M.R.S.A. § 664(3) requires employers, like the Company, to pay employees, like Gants, 1 and ½ times their regular rate of pay for all hours worked in excess of 40 hours within a workweek. The Company intentionally violated 26 M.R.S.A. § 664(3).

56. Because of the Company's continued violation of 26 M.R.S.A. § 664(3), Gants has suffered, and continues to suffer, damages.

WHEREFORE, Gants requests payment, as provided by 26 M.R.S. § 670, of her unpaid overtime wages, an additional amount equal to such unpaid wages as liquidated damages, interest, attorneys' fees and costs, a civil forfeiture of $500 and any other relief this court deems just and proper.

### COUNT II
### Violation of 26 M.R.S. §§ 626, 626-A – Paid Time Off

57. Gants repeats and incorporates by reference all allegations set forth in the paragraphs above.

58. Gants was employed by the Company from approximately October 11, 2017, until February 23, 2018, and was an employee and individual entitled to the protections of the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq.*

59. The Company is, and at all relevant times was, subject to the Maine wage and hour laws, 26 M.R.S. §§ 621-A, 661 *et seq.*

60. The terms of Gants's employment included provisions for PTO.

61. Following departure, the Company failed to pay Gants vacation pay of 43 hours at $31.45 per hour, totaling $1,343.75.

62. Following her last day, the Company violated 26 M.R.S. § 626 by failing to pay Gants in full by either the next day on which she would regularly be paid for PTO, or a day not more than 2 weeks after her last day.

63. On May 8, 2018, Gants sent a written demand for payment of unpaid PTO, as required by 26 M.R.S. § 626-A.

64. Despite Gants's demand, the Company failed to pay her within 8 days as required by 26 M.R.S. § 626-A.

65. Because of the Company's continued violation of 26 M.R.S. §§ 626, 626-A Gants has suffered, and continues to suffer, damages.

WHEREFORE, Gants requests payment, as provided by 26 M.R.S. § 626-A, of her unpaid PTO time as wages, an additional amount equal to twice the amount of unpaid wages as liquidated damages, interest, attorneys' fees and costs, a civil forfeiture of $500 and any other relief this Court deems just and proper.

## COUNT III
### Violation of 26 M.R.S. § 621-A

66. Gants repeats and incorporates by reference all allegations set forth in the paragraphs above.

67. On May 8, 2018, Gants sent a written demand for payment of her unpaid wages, which include unpaid overtime and PTO, as required by 26 M.R.S. § 626-A.

68. Despite Gants's demand, the Company failed to pay her within 8 days as required by 26 M.R.S. § 626-A.

69. The Company violated 26 M.R.S. § 621-A by failing to make timely payments of wages.

70. Because of the Company's violation of 26 M.R.S. § 621-A, Gants has suffered, and continues to suffer, damages.

WHEREFORE, Gants requests payment, as provided by 26 M.R.S. § 626-A, of her unpaid wages, an additional amount equal to twice the amount of unpaid wages as liquidated damages, interest, attorneys' fees and costs, a civil forfeiture of $500 and any other relief this court deems just and proper.

## COUNT IV
### Violation of FLSA, 29 U.S.C. § 207

71. Gants repeats and incorporates by reference all allegations set forth in the paragraphs above.

72. Gants was, at all relevant times, employed by the Company and was an employee and individual entitled to the protections of the FLSA, 29 U.S.C. § 201 *et seq.*

73. The Company was, at all relevant times, subject to the provisions of the FLSA, 29 U.S.C. §§ 201 *et seq.*

74. The Company has more than two employees and $500,000 annually in sales, and the Company regularly uses mail, telephone and e-mail for interstate communication and receives and handles interstate goods.

75. Gants was a "non-exempt" employee as defined by the FLSA and federal regulations.

76. During Gants's employment with the Company, she was required to work without receiving overtime pay when she worked in excess of 40 hours per week.

77. 29 U.S.C. § 207 requires employers to pay employees 1 ½ times their regular rate of pay for all hours worked in excess of 40 hours within a workweek.

78. The Company intentionally and without good faith violated 29 U.S.C. § 207.

79. The Company knowingly withheld overtime wages due to Gants.

80. As a result of the Company's willful violation of the FLSA, Gants has suffered, and continues to suffer, damages.

WHEREFORE, Gants requests damages pursuant to the FLSA, 29 U.S.C. § 216(b), of all her unpaid wages, as well as an additional equal amount of said unpaid wages as liquidated damages, reasonable attorneys' fees and costs and any other relief this Court deems just and proper.

### COUNT V
### Violation of Maine's Personnel File Law, 26 M.R.S. § 631

81. Gants repeats and incorporates by reference all allegations set forth in the paragraphs above.

82. Gants explicitly requested her personnel file pursuant to 26 M.R.S. §631 on April 18, 2018.

11

83. Gants received no response from the Company and failed to send the personnel file to Gants within 10 days as required by law.

84. The Company failed to provide good cause for failing to provide her personnel file.

85. Gants's attorney send a demand for her personnel file on May 3, 2018, which is 15 days after Gants requested her personnel file.

86. The Company e-mailed Gant's attorney with her personnel file on May 11, 2018, which is 23 days after Gants requested her personnel file.

87. The Company is subject to a civil forfeiture, pursuant to 26 M.R.S. § 631 of $25.00 per day for every day that a failure to provide her personnel file continued.

WHEREFORE, Gants requests damages pursuant to the 26 M.R.S. § 631 of $325.00 as a civil forfeiture, reasonable attorneys' fees, costs and any other relief this Court deems just and proper.

DATED: May 30, 2018

Rebecca S. Webber, Esq. (Bar No. 7908)
Jordan Payne Hay, Esq. (Bar No. 5611)
Attorneys for Plaintiff, Amy Gants
SKELTON TAINTOR & ABBOTT
95 Main Street
Auburn, ME 04210
(207) 784-3200
rswebber@sta-law.com
jphay@sta-law.com